All right, Ms. Sheffield, we'd be happy to hear from you whenever you're ready. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. I'm Linda Sheffield. I represent Vaxima and Genfar, two corporations who are co-defendants with Dr. Dong in this case. There are a few issues that I think require a little bit more discussion here. I'd like to talk about the issues of intent, the as well as the method that the investigation, how the investigation took place, and the sort of the incestuous beginning to it, and the sloppy accounting practices. First of all, the defense that was presented at trial was that there was no intent on the part of the employees and the agents of the agency to be happy with the work that was done by Genfar. There was testimony that the vaccine appeared to be effective in monkeys, and that had the search warrant not been executed, that the United States soldiers would have a vaccine. There were Ebola, Marburg, and dengue fevers all in the one vaccine, because Genfar had that multivalent vaccine basis that they worked at something that was different than other companies had. All the money was co-mingled into one account. This is another reason that it appears that it that this, the spending habits were not intentional. At least that was the position of the defense at that time. If that's so, Ms. Chetfield, if that's so, what is the relationship between the three defendants, and also is Vaxima a subsidiary or not of Genfar? Vaxima was a corporation that was owned by Dr. Dong. Dr. Dong was the president and CEO of Genfar. It was Genfar that was a company that was doing research, that was getting the grants, and Dr. Dong and his wife, Dr. Wang, were the scientists there. And there were people working for Genfar. Genfar started out with investors, and it was a research facility, and they developed this multivalent vaccine. And they started... Who owned Genfar? Genfar was a corporation. There were three different people who were the officers of Genfar. It was Dr. Dong, and I forgot the names of the two other people. Right, but does the record show us who owned Genfar? We know who the officers were. Who owned it? No, I don't know who owned it. The person who was speaking on behalf of Genfar and was up front was Dr. Dong and Dr. Wang, but Dr. Dong was the CEO and the president. So Genfar had three different people. That's all I know. And there were investors. In fact, there were $13 million of investors that came in in the beginning. And then there were letters of credit that were issued for Genfar, and there were loans that were taken out for Genfar. I know that doesn't really answer your question, but that's the extent of my knowledge, and I'm sorry, but I don't know more. But that's all that's in the record. May I continue? Yes, please. Thank you. Dr. Dong, it was argued by the government that Dr. Dong had reviewed other grant proposals, that he was an expert on reviewing grant proposals, and that he could have known better, and that this money should not have been spent on the building. The whole issue, and where the problem started, was the building of the research lab that they built. Dr. Dong said that it was his testimony at trial by Mr. Rapik, that, and this was in the NIH, that they got to keep the money as long as it was not used, as long as it was used in conformance with... Why isn't it the role of a jury to decide those kinds of questions? Because intent is an element of intent. I mean, this is a conspiracy with underlying specific intent offenses, so it was very important to determine. I mean, there were two different ways to show that the corporations were liable. One, if the employees and agents of Genfar and Maxima were acting to benefit the corporation, and two, whether they were acting in their own interests, and whether they had the specific intent to violate the law. But what I'm asking you is, those questions that you've just gone over, why aren't they questions for the trier of facts, specifically the jury? Well, the jury had to decide. The jury had to decide whether or not Dr. Dong, on behalf of the corporations, was doing something that was illegal, or whether he intended to do something that was illegal, and whether he intended to do it. The jury decided that adversely to you, correct? Yes, the jury did. So, why should we respect what the jury decided? Because there are... Because there's more to the story. I think that, first of all... Was there anything more to the story that you didn't... that you were not permitted to place in evidence? I mean, you had... Did the district judge give you a full chance to present your case? Well, I didn't try the case, Your Honor, but I think that... I think that... I think that they were given a chance to present their case. I think that the problem is that not all of the... There was one problem was that not all of the case was presented. One of the issues that I found that was not developed in the case was whether or not the employees and agents acted in their own interest in violating the law, if they did violate the law, and not for the benefit of the corporation. And there are... I mean, the question I have is this seemed to be... At the heart of what you're presenting, the question is whether this is simply a civil breach of contract case, or whether it's a... Rises to the level of criminality. And I'm not sure exactly what the dividing line is, but the dividing line is made out by what prosecutors decide to charge if they can prove it. And one of the... You know, there had been a single irregularity here that would cause some questions on my part, but the list of irregularities in the relationship with the government was quite extensive. And I don't understand why... I mean, just one of them that struck my... Hit my eye was that GenPAR did not hire a quality control director as required by the NIH grant, but kept the allocated salary anyway. That's just one of... An illustrative example of one of many. And that's not just a breach of contract, that's out-and-out fraud, isn't it? Well, can I respond? I think that what the testimony at trial was, that they used other people to fill that position, and that those people were overseeing the grants, and that they were unable to hire this person. Bob, that's a fair point, but what I'm saying is the jury didn't buy it, right? No, the jury didn't buy it, but what you have to understand is if the money wasn't spent, according to Dr. Repik, NIH, it was allowed to be redirected to other areas that were consistent with the grant proposal. So even if they didn't hire this person, they were... As long as that money was spent in the grant proposal, it didn't go outside of that proposal. And Dr. Repik also said that... It was sort of contradictory, what he said, because he said, first of all, that a building was mentioned in the grant proposal, but they didn't have authority to spend the money on the building. Yet, then he testified on cross-examination that the money that they didn't spend, they could use so long as it was in accordance... Well, this is one of the... Your response raises a question, because the accounting practices here... I mean, normally, what you look for in audits and accounting is something that crosses I's and crosses T's and dots I's. You don't always get perfect accounting, but the accounting practices here were unbelievably confused. I mean, funds were shifted from one purpose to another, and they were... All the rest... I mean, here, the grant with NIH required that the corporation outsource certain studies at predetermined cost, and the corporation performed those studies rather than outsourcing them under the terms of the grant. The corporation performed those studies in-house cheaper and just kept the leftover funds for himself or itself. And that's sort of emblematic of the careless accounting practices here. There seem to be funds that are put in boxes and dedicated to uses where they don't at all belong, and so that's the overall picture I'm getting. Now, tell me why that's wrong. Well, there was a lot of sloppy accounting, and I'd like to go to the sloppy accounting of the government also in preparing this case, because there was sloppy accounting on the part of GenFAR, but there were apparently two different areas of bookkeeping. There was the QuickBooks that were kept in office, and then there were the books of Linda Richard, which Mr. Vaughn talked about. Now, Mr. Vaughn did his analysis according to QuickBooks. Vaughn is the person who testified. They tried to get him qualified as an expert. The defense objected. He was only allowed to testify as a witness, and he was prepared to schedule both of money, he said, that may not have been grant related, and then inflows that may not have been grant related. He did not account for the 25% of the money that was allowed for discretionary spending as long as it was within the confines of the grant. He said he could not follow the money because of the commingling with investor funds. He said he did not know who was in charge of bookkeeping at GenFAR. He said he was not doing an audit because when you audit, you have some degree of comfort in what supports what is in the accounting books and records. And he said he did not have comfort in the records of GenFAR. And this is all in the testimony. And he said if this were an audit, he would not be able to express an opinion about the accuracy of the audit. He said, I did try to thumb through records with the accepted government standard. But he used QuickBooks. I don't know why these Linda Richard records were not put in evidence. I don't know why she was not called. There was testimony by Vaughn that there were records of, and testimony by Van Horace also, about all these. Well, Counsel, how does all this lead to any error? Well, how it all leads to error. As far as intent, and as far as dollar amount in this case, and as far as how much money it is in the forfeiture, it all relates to, first of all, there was no intent to violate the law. And if there was, it was not to benefit the corporations. That's my position here Secondly, we don't know how much of this money was really misdirected. Because they were unable to show that because the person that they hired to do this evaluation of the accounts didn't use both sets of books. We never heard from the CPA for GenFAR, Linda Richards. Nobody called her. And she wasn't indicted. I checked that. And she's still around. Well, those all sound like arguments somebody would make in a 2254 proceeding as opposed to direct appeal. Well, this is what was presented. I mean, I'm going from the record in this case, Your Honor. And I think that this should have been a civil action. First of all, let me just go into how this case started. And I just don't want to run out of time. I've got three more things I want to talk about. Uh, and I'm down to 15 seconds. Can I keep going? Why don't you summarize briefly, because you have some rebuttal time and we'd be happy to hear from you. Okay. Do you want to use your rebuttal time now? Oh, no, but I want but I've not talked about posse comitatus and federal funds yet. And that's very important here. Well, you're the one that would would choose what you wanted to highlight. Go ahead and talk about it a little bit. Okay. Very, very, very quickly. First of all, posse comitatus was phrased in multiple suppress. And posse comitatus looked like it was going to be like a real nothing thing. Only the Ninth Circuit has really had any cases that were returned en banc. But Harvard Law School seems to be writing a lot about it lately. And the the deterrence aspect of posse comitatus is has become very important. This case started because Elaine Van Vork, who was working in finance in GenFAR, decided... violation if if Mr. Leonard was not a member of the military. I thought the posse comitatus act was directed at not using the military for a variety of civilian purposes, but the special agent here was not a member of the military. He was in the military. He was... Let's see. I thought that it was established in the record that he was, he was with the... Well, there's a statute that says no member of the Inspector General's office can be a member of the military. He was with the Defense Criminal Investigative Services. And the government did say that he was that that was part of the Office of the Inspector General. But I think that that the way that this case started was, was very incestuous and very improper. And it basically, it cut out the, the normal chain of criminal investigation, coming from a former US attorney who, who just left the office, contacting the current US attorney who then contact Agent Leonard who started this investigation. And so it was improper from, from the beginning. And there is a great deal of concern between... Why don't you explain, let me ask you this, why don't you got some rebuttal time and why don't you expand on that point and expand on the Inspector General and the posse comitatus question, if you want during rebuttal, would that be okay? Yes, sir. Can I say one thing about federal funds before I leave? No, we've given you some extra. And I appreciate it. We do, we do appreciate your argument. And also, I don't want the time, the extra time that you've taken to count against your rebuttal time. I want to make sure that you get your full rebuttal time. Okay. Yes, sir. Thank you very much, Ron. All right. Now let's hear from Mr. Williams. Good morning, may it please the court. My name is Nathan Williams. I'm an Assistant U.S. Attorney in the District of South Carolina. As Ms. Sheffield has referenced, this case began in 2009. It was initiated through a whistleblower action, a key TAM, and Ms. Van Boris, who has been referenced, who was an accountant with both Genfar and Vaxima, gave information to federal who was related to both of those companies, was misusing grant funds or contract funds, and converting them to improper uses, as well as making false representations to the grantors. Although the case started in 2009, it went to trial in 2014. It was tried to a jury in 2014. And then some counts that were hung went to a bench trial in 2016. And in summary, what was shown is that although Genfar and Vaxima were involved early on in legitimate research, starting with HIV research, they transitioned over into biodefense. And by working in the biodefense field, they were able to obtain federal grants, and they also had private investors who were putting money into the company. Reflect my recollection into what part of this was the bench trial and what part of it was the jury trial, okay? Sure. And it's a little complicated because there were not only multiple counts, but multiple counts that were dismissed prior to trial. So the jury trial, the conspiracy count, which is count one, was hung. At the bench trial, that count was found guilty for all defendants. Counts two through six were dismissed prior to either of the trials. Those were theft of government property. Count seven was a theft of government property count, and that was found guilty at the jury trial, so it was not heard at the bench trial. Counts eight through 12 were dismissed. Those were all, again, 641 theft of government property counts. And really, the heaviest counts in the case, the wire fraud counts, which are counts 13 through 34, there was a wide range of sort of convictions at the jury trial. But essentially, the two companies were found guilty on almost all of those counts, except for some strange reason. Vaxima was hung up on count 16. It's an anomaly sort of in the verdict. But then that was also found guilty at the bench trial. So yes, a lot of different counts. Were the two corporations and Dr. Dong tried at the same time? Yes, they were at both trials. They were all co-defendants all tried at the jury trial and the bench trial. The wire fraud and mail fraud counts were submitted to the jury? That's correct. And the jury found Vaxima and Genfar guilty of almost all of those counts, apart from the one hung count with Vaxima, which was then carried over to the bench trial. Now, Dr. Dong was not found guilty of those counts. He was found guilty of some, I'm sorry, he was found guilty of some of those counts at that time. But for these defendants, yes, they were convicted at the jury trial for the most part. Mr. Williams, nobody's talked about this, but it seems to me the most culpable issue in the case is this joint and several liability in light of the Honeycutt decision. Can you speak to that? Sure. I mean, so Honeycutt goes to co-defendant liability. And I think in this case, quite simply, this money all flowed through all of these businesses. And so I would say that they are all cents for the money that was traced to these businesses. It's not a situation like Honeycutt, where a defendant was convicted of taking the money and then co-defendants were attributed that money in the forfeiture context. So I think Honeycutt is- So when the grant money came in, it went through either Genfar or Vaxima? Correct. And then you all have sort of talked about some of the accounting. It wasn't as it would be helpful, but to get back to one of the questions I believe Judge Floyd asked, Vaxima was a- Well, to follow Judge Floyd's question on Honeycutt, which turned on what obtained meant in that particular statute, even though you've got a different statute here, it would seem that if the money flowed through the corporations, they clearly would have obtained the funds. Correct. And they were represented in all of the documentation as well. Dr. Dong was effectively an actor and an owner of those companies, but those companies were the ones who were obtaining the funds. And as was testified to, Vaxima was owned by Dong, but really created as a subsidiary of Genfar to produce vaccines. So it was, and this was in the joint appendix, the government's joint appendix 34 to 37, where Dr. Blong, who was a key member and a key player in all of those companies, testified that essentially Vaxima was created in an effort to contract for Genfar. So they're very closely related. And as she testified, three of Vaxima's four employees were paid with money transferred from Genfar's bank account. Vaxima paid rent to they were very interchangeable in terms of the work that was going on and were subsidiaries and essentially did the exact same work, but were structured in a particular way. So yeah, that money flowed through those companies equally. And they were fairly indistinguishable apart from being on paper and doing some of their purposes. To get back to sort of what was presented at trial or the trials, there was legitimate research going on, but they moved over to a biodefense posture in order to obtain grants, but they also were obtaining investor funds. And I think it's critical to understand that from this start, the idea behind Genfar and Vaxima was to become a profitable private company. And that is in direct conflict with what the grants are allowed for. Dr. Dong wanted to produce a facility, a building, an impressive building that was going to cost millions of dollars. And he simply did not have the investor funds to do that. So what he did is when he ran out of investor funds, began converting grant funds over to that purpose. And I think it was very clear throughout the testimony that the limitations on those grants was not to use them for personal profit, for company profit, or for the type of things that investor funds could be used for. And it is fairly commonsensical that Genfar began trying to seek profit. They had investors. And when that money ran out, whether it was a business decision or otherwise, they made false representations. They claimed to be saving money by cutting corners and essentially converted money that couldn't be used for that profit reason. They began using that money that was, you know, grant money that was not permitted for that type of profit or that type of use to then construct a building. And there certainly are some concerns. What you're saying, and it seems to me that they're trying to indicate that this really is a civil breach of contract case, and that the party is, that the government is really confined to its contractual remedies. And what you're saying is, there are two things, two elements about this case that make it criminal. One is just flatly false representations to the government about what was being done with particular funds. And the other problem, aside from the false misrepresentation, was the complete misallocation of funds for purposes that were beyond the scope of the grant and in direct contradiction to the terms of the grant. So, I gather you're saying, look, this is not just a civil contract case. The government didn't have to present it as such because of the misrepresentations that were made, and because of the misallocations that were made knowingly. These weren't inadvertent mistakes, but isn't that the gist of it? Yes, and that has frankly been the gist of it since the start. I mean, the defense was always there was no criminal intent. And, you know, there was a question to is crossed when false statements and misrepresentations are made. A contract becomes very different when someone starts lying to the folks who are handing out the money about whether they've hired certain people, whether those people exist, whether studies have been done. And so, first, false statements in the procurement of the funds make it fraudulent. And then as your honor has identified, knowingly using the money for improper purposes once it's obtained, when it had been not used, was the second level and arguably the most significant in terms of money amount of fraud. So, it was, yes, lying at certain points and then certain milestones to continue getting funding. And then I think in a more significant way in terms of money amount, misusing the funds when they should have been returned had they not been necessary. And that was the idea of... They could argue that the misuse of the funds and contrary to the terms of the grant was simply a normal breach of contract claim. If they misuse funds for a purpose that the grant didn't allow it. Why isn't that just a breach of the terms of the grant? How does that become criminal? Sure. And it becomes criminal when there's intent to defraud. So, you know, there were situations, for instance, when Rep. Byrne confronted Dr. Dong about his it occurred to her that it was fairly elaborate for what his work was. And his response to her is that it was being done with investor money. That was simply not true. And so, when we talk about intent to defraud, it's his knowing that the money was being used improperly and in some ways covering it up. If he had said, I use the grant funds, I'm allowed to do that, aren't I? And she said, no. And then he gave the money back. He probably doesn't get indicted and he probably doesn't get convicted. But that simply was not what he was doing. In fact, he was telling people to save money, meaning not spend it on certain things so he could use it for construction. And then I think, you know, strong evidence of that concealment was his sort of strong evidence of intent was his concealment at certain levels. Could you just touch briefly on the Comitatus question that is raised? My thought was that the special agent was not a member of the military so that the act was not implicated and that DCIS actually had positive statutory authority to investigate fraud involving DOD. But could you touch on the Posse Comitatus point that your opposing counsel has raised? I will and I don't know that I can touch on it much more than that. But essentially, the Posse Comitatus Act is intended to prevent military intrusions into civilian affairs unless Congress otherwise authorizes it. So, you know, the starting point is whether there was a military intrusion into civil affairs here. And as your honor has mentioned, DOD OIG is prohibited from being in the armed forces, whether that's the inspector general himself or the agent in this case. There simply was not any military action taken that would have come underneath the Posse Comitatus Act. The special agent was not a member of the military, as I understand it. I mean, he was not a member of the armed forces. Is that correct? That's correct. He was not and his office was not. So under any circumstances, there was no sort of military intrusion. And setting that aside, you know, there has been the Posse Comitatus Act also allows for acts of Congress to make distinctions. And we have that in this case as well, in the sense that Congress has said that the Posse Comitatus Act does not apply to the Department of Defense OIG. And so from several different angles, there simply is not sort of any applicability of the PCA to this case. You know, I think it came up in several contexts and it sounds... Counsel, am I correct that if there is a violation of the Posse Comitatus Act, that the remedy is a criminal proceeding against the member of the military who violates it and that there is no civil remedy? That's right. And it's a bit strange that there is no exclusion and that's under U.S. v. Al-Talib. It's a little unusual and I think maybe one of the interesting parts of this act is that the options are a criminal charge, ideally a two-year offense, or no exclusion in court. I mean, it's a very stark option, but yes, Your Honor, you're correct. The remedy for a violation would be a criminal charge, but under Al-Talib, it would not necessarily be exclusion of evidence at trial. And that was taken up by the district court. And really what the district court leaned on was maybe the sort of the bottom line answer, which is exclusion would not be the remedy, even if the act were violated. The remedy would be a criminal charge. I'm going to ask my co-panelists if they have any additional questions of you. Judge Floyd? No, sir. Judge Agee? No other questions. All right. Do you have anything further, Mr. Williams? I do not. Thank you all. I appreciate your time. All right. Let's hear further from Ms. Sheffield. Ms. Sheffield, I think you have five minutes of rebuttal time. Yes, Your Honor. Thank you very much. Going with my argument previously, that if Dr. Dong and the other employees, agents and employees of these corporations, were acting for their own benefit, then the corporation could not be liable. If Dr. Dong was trying to build a research empire with his Taj Mahal research lab that he was talking about to everybody, and he was acting for his own benefit and not for the benefit of the corporations. I mean, Genfar and Maxima were research corporations. They were not supposed to be profit-making corporations. And this appeal was for the corporations, not for Dr. Dong, and the responsibility of these corporations for what went on there. And all of the arguments that are being made are about misrepresentations made by these agents and officers of the corporations, which actually benefit them. Also, as far as the misrepresentations on timesheets, which were required by the grants, there was testimony by a few people. In other words, when they were interviewed by Mr. Leonard, who conducted the investigation, they would say one thing, and then when it came time to testimony at trial, their times changed. For example, Ms. W., who was working on grants and supposed to be research and other things or administrative things for the grants, she had told Agent Leonard that she spent 60 percent of her time on the grants, whereas at trial, then she testified she spent 80 percent of her time. A lot of this became aligned to assist the prosecution when everybody was getting in trouble. Now, granted, she said that Dr. Wang told her to put these numbers down when she filled out the timesheets, but then she came and changed her testimony at trial and made it even greater. I'd like to speak to Count 7, the bioreactor. Dr. Wang had testified that, first of all, the CPR that was submitted was not signed. She testified that she was confused. She didn't know about it. Dr. Dawn had said that this was money that was allowed to be reimbursed because of bioreactor. Apparently, they had that before, and that was simply reimbursing grant money. As far as the money, my opposing counsel had said that this started out with misrepresentation. These grants did not start out with misrepresentation. They applied for grants. They stated what they wanted to do and what they could accomplish, and they gave prices. There was no testimony that they were making things up. Making things up only came later on when Van Boris came forward and said, well, these people are not really telling the truth about all of this. She was looking at some of the accounting things and saying, well, there's something very wrong here, when she said a PTAM act, but there was no fraud in the inception whatsoever. This was an honest effort on the part of the corporations to do this, and any activities or any criminal acts that took place subsequent to that were not done for the benefit of the corporation. I think that is abundantly clear in the testimony that this was done. If there were criminal acts that were accomplished in this case, they were done for the benefit of those actors. However, catching on the one other thing, this should have been a civil suit. This should have just gone forward in the PTAM action as a civil case, get the money back if money was owed, give the PTAM people their 30%, and this never should have been a criminal prosecution. I think this was all a grab for the building, but as it turned out, there was not much money made for the building because it sat around for so long in an unfinished state. But the corporation should not be held responsible for these actions, and I would ask the court to reverse their conviction. Thank you, Your Honor. Thank you. If either of my co-colleagues have further questions of you, I'd be glad to hear them. Judge Agee, do you have any further questions? No questions. Judge Floyd? No questions. All right, well, I want to thank you both, and we appreciate very much your argument. I'm sorry we can't come down and shake hands with each of you and thank you personally, but you do understand the circumstances, and we appreciate that. All right, I'll ask the courtroom deputy please to adjourn court until this afternoon. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, G. Steven Agee, Henry F. Floyd